IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KODIAK CAKES LLC,<br><br>                      Plaintiff,<br><br>v.<br><br>CONTINENTAL MILLS, INC.,<br><br>                    Defendant. | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br><br>Case No. 2:18-CV-783 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction. For the reasons set forth below, the Court will grant the Motion.

## I. BACKGROUND

Plaintiff Kodiak Cakes LLC ("Plaintiff) is a Delaware corporation with its principal place of business in Park City, Utah. Since 1982, Plaintiff has manufactured and sold high protein, whole grain pancake mix, among other products. In 2014, following some media attention, Plaintiff experienced significant growth in its commercial success. Plaintiff is now a major competitor within the pancake mix industry, and its products are sold at health food stores and major retailers such as Walmart and Target.

Plaintiff's packaging is pictured below.



The packaging on the left was distributed and sold beginning in 2014 and the packaging on the right is the most recently designed packaging. Both versions are currently being sold.

Plaintiff claims its protected trade dress consists of the following unique elements: "a kraft box featuring a distinctive tan, red, black, and white color scheme characterized by: a light tan background color offset by a bold, full bleed black border; alternating use of serif and sans serif fonts; standout appearance of reference to 'Protein Packed' and 'Whole Grains.'"[1]

Defendant Continental Mills, Inc. ("Defendant") is a Washington corporation with its principal place of business in Tukwila, Washington. Under the brand "Krusteaz," Defendant also manufactures and sells pancake mix, among other products, and has done so for 86 years. Defendant's Krusteaz-branded pancake mix is sold at major retailers throughout the United States. Krusteaz pancake mix is generally packaged in a high-gloss box featuring a large image of a stack of pancakes and a Krusteaz logo in red across the top of the box. An image of its original protein pancake mix product is shown below.

---

[1] Docket No. 2 ¶ 14.



In June 2018, upon "seeing changes in the pancake mix market and after conducting its own research,"[2] Defendant opted to redesign its protein pancake mix product. "It conducted focus groups, tested different formulae, and analyzed market data, including considering the strengths and weaknesses of the protein pancake mix market leader, Kodiak."[3] At the conclusion of its market research, Defendant put the following box design into production.



After Defendant put this design into production, Defendant continued its research and decided it would eventually design a different packaging that would "properly account for its consumer research."[4] However, before Defendant could implement a different design, Plaintiff contacted Defendant to inform Defendant that it believes their current packaging infringes Plaintiff's trade dress. Following communications between the parties, Defendant accelerated its

---

[2] Docket No. 28, at 2.

[3] *Id.*

[4] *Id.* at 3.

redesign plan and has agreed to cease shipping products with the current packaging by January 31, 2019.

Plaintiff filed suit in this Court on October 10, 2018, for trade dress infringement in violation of 15 U.S.C. § 1125, among other causes of action. Plaintiff filed the Motion for Preliminary Injunction now before the Court on November 2, 2018, seeking an order enjoining Defendant from "[c]ontinuing to sell, advertise, or promote any product using the infringing packaging, or using any packaging that is otherwise confusingly similar to the Kodiak Trade Dress."[5] This includes a recall of all of the offending products by a date to be determined by the Court.

## II. DISCUSSION

To obtain a preliminary injunction, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest."[6] "A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule."[7]

## A.  LIKELIHOOD OF SUCCESS

"[T]he very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of the plaintiff's suit, prior to the resolution at trial of

---

[5] Docket No. 16-1, at 2.

[6] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

[7] *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

the factual disputes and difficulties presented by the case"[8] Therefore, "a plaintiff must present a prima facie case but need not show a certainty of winning."[9]

Plaintiff seeks a preliminary injunction based on its claim of trade dress infringement. "A product's trade dress 'is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques.'"[10] "To establish a claim of trade dress infringement, a plaintiff must show: (1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional."[11]

### 1. Distinctiveness/Secondary Meaning

Plaintiff must first show that the its trade dress is inherently distinctive or that it has acquired secondary meaning. "A trade dress is inherently distinctive if its 'intrinsic nature serves to identify a particular source.'"[12] "Trade dress, like trademarks, are classified in the following categories of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful."[13]

> A generic mark refers to a general class of goods, such as "cola," of which an individual article is but a member. Such marks do not indicate the particular source of an item and are not entitled to any trademark protection. A descriptive mark identifies a characteristic or quality of an article or service, such as its color, odor,

---

[8] *DTC Energy Grp., Inc. v. Hirschfeld*, No. ---F.3d---, 2018 WL 6816903, at *6 (10th Cir. Dec. 28, 2018) (internal quotation marks and citation omitted).

[9] *Id.* (internal quotation marks and citation omitted).

[10] *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1225 (10th Cir. 2007) (quoting *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 977 (10th Cir. 2002)).

[11] *Id.*

[12] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1147 (10th Cir. 2016) (quoting *Sally Beauty Co. Inc.*, 304 F.3d at 977).

[13] *Id.* at 1147–48.

function, dimensions, or ingredients. A descriptive mark may receive protection only when it has acquired a secondary meaning by becoming distinctive of the applicant's goods in commerce. Suggestive marks suggest rather than describe a characteristic of the product and require the consumer to use imagination and perception to determine the product's nature. Arbitrary marks use common words, symbols, and pictures that do not suggest or describe any quality or characteristic of the goods or services. Finally, fanciful marks are words invented or selected for the sole purpose of functioning as a trademark. Suggestive, fanciful, and arbitrary marks are considered inherently distinctive and entitled to trademark protection.[14]

While the Tenth Circuit has utilized these categories in the trade dress context, it has "not mandated exclusive use of that framework."[15] The Tenth Circuit has stated that it may be useful to supplement that test using the test set out in *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*[16] The *Seabrook* test considers whether the trade dress is: (1) "a common basic shape or design" (2) "unique or unusual in a particular field," and (3) "a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods."[17]

Plaintiff explains that its protected trade dress includes the following elements: "a light tan background color offset by a bold, full bleed black border; and the use of contrasting black, red, and white lettering and backgrounds. In addition, the Kodiak Trade Dress makes alternating use of serif and sans serif fonts and includes standout appearance of references to 'Protein Packed' and 'Whole Grains.'"[18] Plaintiff's mix also prominently includes its logo of an encircled bear and the "Kodiak Cakes" brand name.

---

[14] *Sally Beauty Co., Inc.*, 304 F.3d at 976 (internal quotation marks and citations omitted).

[15] *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1245 n.2 (10th Cir. 2016).

[16] 568 F.2d 1342 (C.C.P.A. 1977).

[17] *Forney Indus., Inc.*, 835 F.3d at 1246. Consideration of these factors does not change the Court's analysis.

[18] Docket No. 16, at 7.

The Tenth Circuit has held "that the use of color in product packaging can be inherently distinctive (so that it is unnecessary to show secondary meaning) only if specific colors are used in combination with a well-defined shape, pattern, or other distinctive design."[19] In reaching this conclusion, the Tenth Circuit examined a number of cases from other courts.

In *Paddington Corp. v. Attiki Importers & Distributors, Inc.*,[20] the Second Circuit found that the trade dress of a bottle of liquor was "undeniably arbitrary"[21] and, therefore, inherently distinctive where:

> There [was] no evidence in the record of any industry practice of using a design like the one that appear[ed] on the bottle's labels. There [was] nothing descriptive about the bottle and label design that conveys anything about its particular contents, except for the use of the trademark "No. 12 Ouzo," . . . and the fact that the bottle [was] of a style such that it indicates to the observer that it contains a liquid that probably is potable.[22]

The court found that "the tone and layout of the colors, the style and size of the lettering, and, most important, the overall appearance of the bottle's labeling," "were selected from an almost limitless supply of patterns, colors and designs" and were, therefore, "undeniably arbitrary."[23]

In *AmBrit, Inc. v. Kraft, Inc.*,[24] the Eleventh Circuit affirmed a district court's finding that the trade dress of a Klondike Bar wrapper was inherently distinctive. "[T]he Klondike wrapper with its square size, bright coloring, pebbled texture, polar bear and sunburst images, and distinctive style of printing is a complex composite of size, color, texture and graphics creating a

---

[19] *Forney Indus., Inc.*, 835 F.3d at 1248.

[20] 996 F.2d 577 (2d Cir. 1993).

[21] *Id*. at 584.

[22] *Id.*

[23] *Id.*

[24] 812 F.2d 1531 (11th Cir. 1986).

distinctive visual impression."[25] The circuit court concluded that "[t]he trade dress [did] not describe the ice cream product, rather it suggest[ed] to the consumer the coldness of the product."[26] Therefore, the court found that "the overall appearance of the Klondike trade dress and of its constituent elements [were] arbitrary or suggestive."[27]

Similarly, in *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*,[28] the district court found the packaging of Splenda artificial sweetener was inherently distinctive. The Splenda trade dress comprised of a yellow, blue, and white color scheme, and a "combination of pictorial elements, colors, labeling, and layout (including the prominent placement of the product name surrounded by a distinctive white cloud)."[29] The court rejected the defendant's argument that the trade dress could not be inherently distinctive because it included elements that were merely descriptive of the product or common in the industry, such as images of a coffee cup, teaspoon, and pitcher. The court reasoned that, considering "[t]he combination of pictorial elements, colors, labeling, and layout," "the overall Splenda trade dress [was] arbitrary or fanciful and thus inherently distinctive."[30] The court also found it insignificant that other sweetener products used the same color scheme as Splenda because "Splenda's principal competitors [did] not use [the same] color scheme."[31]

---

[25] *Id.* at 1536 (internal quotation marks and citations omitted).

[26] *Id.* at 1537.

[27] *Id.*

[28] 566 F. Supp. 2d 378 (E.D. Pa. 2008).

[29] *Id.* at 389.

[30] *Id.*

[31] *Id.* at 390.

Aside from its use of the words "Protein Packed" and "Whole Grains," none of Plaintiff's elements are descriptive of pancake mix. Additionally, there is no evidence that this color scheme or design is commonly used in the pancake mix market. Defendant provides examples of various pancake mixes in the marketplace that also use a kraft-type box and/or a dark border offset by a light or tan background. However, viewed in its entirety, Plaintiff's trade dress is visually distinct from each of its competitors. As with the cases discussed above, "the tone and layout of the colors, the style and size of the lettering, and, . . . the overall appearance of the [package's] labeling" were "selected from an almost limitless supply of patterns, colors and designs" and are accordingly "undeniably arbitrary."[32]

Defendant argues that Plaintiff's claim cannot succeed because it has not adequately articulated the elements of its trade dress. This argument is not persuasive. The Tenth Circuit in *Forney* found that the Plaintiff had not sufficiently identified its trade dress where the trade dress as described was not definite. For example, the *Forney* Court found it significant that the plaintiff identified the trade dress as follows: "that the yellow [bar] 'typically' begins higher than red [bar]," and "the [l]ettering and accents 'may' be red, yellow, white, or black."[33] There is no such uncertainty with Plaintiff's description of its trade dress in this case.

Based on the above, the Court finds that Plaintiff is likely to succeed in demonstrating that its trade dress is inherently distinctive. Even if not inherently distinctive, the Court finds that Plaintiff has demonstrated that its trade dress has acquired secondary meaning. Secondary meaning can be shown by circumstantial evidence such as: (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the

---

[32] *See Paddington*, 996 F.2d at 584.

[33] *Forney Indus.*, 835 F.3d at 1252.

efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.[34] These factors are discussed in more detail below in relation to the likelihood of confusion factors,[35] but they support a showing of secondary meaning.

### 2. *Likelihood of Confusion*

In determining whether a likelihood of confusion exists, courts are to consider the following factors: (1) the degree of similarity between the products; (2) the intent of the alleged infringer in designing its product; (3) evidence of actual confusion; (4) similarity in how the products are marketed; (5) the degree of care likely to be exercised by purchasers; and (6) the strength of the trade dress.[36]

#### i. Degree of Similarity

"[M]arks may be confusingly similar if, as entities, they look or sound similar or convey the same idea or meaning."[37] Elements to be examined include the products' "appearance, pronunciation of the words used, verbal translation of the pictures or designs involved, and suggestion."[38] In examining these elements, the Court "must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side

---

[34] *Savant Homes, Inc.*, 809 F.3d at 1148.

[35] *Vail Assoc., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 866 (10th Cir. 2008) (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 (9th Cir. 1980)) ("Secondary meaning and likelihood of buyer confusion are separate but related determinations, the relationship rising from the same evidentiary findings.").

[36] *Gen. Motors Corp.*, 500 F.3d at 1227.

[37] *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986).

[38] *Id.*

by side with the protected trademark."[39] "Similarities are to be weighed more heavily than differences, especially when the trademarks are used on virtually identical products packaged in the same manner."[40]

The similarities of the products include the following: a kraft box; a similar color scheme with a black border, tan foreground, and red, black, and white lettering and images; similar fonts; and prominent placement of the words "protein" and "whole grains." The differences are as follows: Plaintiff's packaging includes a large image of the Kodiak Cakes bear within a circle while Defendant's packing includes an image of a large stack of pancakes. The placement of images and wording are different, each bears its own logo, and there are subtle differences in the colors, layout, and font design.

Considering these elements as a whole, the Court finds this factor weighs in favor of Plaintiff. Defendant is correct that the Kodiak bear logo, featured prominently on all of Plaintiff's products, is not found on Defendant's packaging. Instead, Defendant's packaging features a large drawn image of a stack of pancakes. However, when weighing the similarities more heavily than the differences and examining each of the boxes singly, the two boxes present a confusingly similar appearance and convey the same overall message. This is particularly true when viewing the competing companies' pancake mix packaging presented in both parties' briefing.[41] Prior to Defendant's new packaging, Plaintiff's design was noticeably unique when compared to the other leading pancake mixes that consumers would likely encounter when selecting a pancake mix.

---

[39] *Sally Beauty Co.*, 304 F.3d at 972.

[40] *Beer Nuts, Inc.*, 805 F.2d at 925.

[41] *See* Docket No. 16, at 9; Docket No. 28, at 9.

ii.     Intent to Copy

"[D]eliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion."[42] "One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived. All doubts must be resolved against him."[43]

Direct evidence of intent to copy is not necessary. For example, in *Beer Nuts, Inc.*, the Tenth Circuit found the evidence of intent to copy weighed in favor of the plaintiff where: the plaintiff's use of its trademark predated the use of defendant's trademark by two decades; defendant had distributed its original product for many years prior to developing its new, infringing product; the plaintiff's product was successful; the defendant could not deny knowledge of plaintiff's product nor deny knowledge of its popularity; the products were sold in the same markets; the packages and names of the products were similar; and the defendant's advertising agency advised against use of the trademark.[44]

Here, the evidence shows that Defendant originally packaged its protein pancake mix similar to each of its pancake mixes, which included the high-gloss box with an image of a large stack of pancakes and the Krusteaz logo prominently placed across the top of the box. Defendant's protein pancake packaging changed to its current design after Defendant conducted a market research study. Defendant admits knowledge that Plaintiff is leading the protein

---

[42] *Beer Nuts, Inc.*, 805 F.2d at 927.

[43] *Sally Beauty Co.*, 304 F.3d at 973 (internal quotation marks and citation omitted).

[44] *Beer Nuts, Inc.*, 805 F.2d at 927.

pancake mix industry and further admits that Defendant's market research was conducted, in part, to understand why Plaintiff had achieved such success. Defendant also admits that it sought to create a product to compete with Plaintiff's product. After the study, Defendant produced a packaging for its protein pancake product in sharp contrast to its traditional pancake mix packing and, as discussed above, obviously similar to Plaintiff's product.

Considering the case law cited above, this evidence is sufficient to create an inference that Defendant intended to copy Plaintiff's trade dress. Defendant argues that its only intent was "to create a product to compete with Kodiak."[45] However, given the obvious similarity between the two companies' packaging, and Defendant's admitted efforts to study Defendant's success, the Court finds this factor weighs in favor of Plaintiff.

        iii.     Evidence of Actual Confusion

"Although not necessary to prevail on a trademark infringement claim, evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion."[46] However, an absence of evidence of actual confusion "does not necessarily support a finding of no likelihood of confusion, especially when the products involved are inexpensive."[47]

In conjunction with its Motion, Plaintiff offered the following evidence of actual customer confusion: (1) a statement from Plaintiff's former employee stating that he spoke to "several customers who expressed confusion after seeing the Krusteaz protein pancake mix packaging in stores;"[48] (2) a customer who reported that she sent her father to the store to purchase Kodiak Cake pancake mix and described the general trade dress to her father, even

---

[45] Docket No. 28, at 16.

[46] *Sally Beauty Co.*, 304 F.3d at 974.

[47] *Id.* (internal quotation marks and citation omitted).

[48] Docket No. 17 ¶ 3.

taking the time to write it down, and her father returned with a box of Krusteaz pancake mix instead;[49] (3) a customer contacted Plaintiff stating his confusion between Plaintiff and Defendant's packaging;[50] (4) a customer posted an Instagram photo of himself with a box of Krusteaz pancake mix and included a caption identifying the box as Kodiak Cake pancake mix;[51] and (5) a grocery store stocked a large display box at a grocery store, purchased by Plaintiff to display its product, with both Plaintiff and Defendant's pancake mixes.[52] Plaintiff's Reply included evidence of an additional instance where a husband and wife, both Kodiak employees and consumers, thought the Krusteaz mix was Kodiak mix before looking more closely.[53]

At the hearing, Plaintiff's CEO similarly testified that Plaintiff had received statements from customers who had purchased Defendant's product thinking that it was Plaintiff's mix. After the hearing, Plaintiff provided a Supplemental Appendix identifying other instances of customer confusion and instances where people have commented on the similarity between the two packages.

In addition to this evidence, Plaintiff has also provided charts using sales data provided by SPIN, a subscription service that provides sales figures for various products in the food industry. These charts compare the sales data for the parties' protein mixes. They show that Defendant experienced growth after it started using the accused package and that growth increased during the time when its mix would have become distributed more widely. In contrast, Plaintiff's sales decreased during that time.

---

[49] Docket No. 18.

[50] Docket No. 19.

[51] Docket No. 20 ¶ 18.

[52] *Id.* ¶19.

[53] *See* Docket No. 36.

Defendant argues that Plaintiff's evidence is insufficient to demonstrate actual confusion. The Tenth Circuit has held that "isolated instances of actual confusion may be de minimis."[54] "Probable confusion cannot be shown by pointing out that at someplace, at some time, someone made a false identification."[55]

In *King of the Mountain Sports, Inc.*, the Tenth Circuit found that seven isolated instances of actual confusion to be de minimis.[56] The court found that "[t]his handful of anecdotal evidence" did not support a finding of likelihood of confusion, especially in light of the lack of similarities between the parties' use of the mark.[57] Other cases are in accord.[58] Here, the exact number of instances of actual confusion is unclear. However, considering all the evidence, including the examples contained in the Supplemental Appendix, Plaintiff's evidence of actual confusion is more than de minimis.

To combat Plaintiff's evidence of actual confusion, Defendant hired an expert to conduct a survey. Evidence of actual confusion "may be introduced through surveys, although their evidentiary value depends on the methodology and questions asked."[59]

Defendant's expert reported that, "[c]ontrolling for pre-existing beliefs, guesses, other background noise that respondents may bring to the survey, and the non-asserted design elements

---

[54] *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999).

[55] *Id.* (internal quotation marks and citation omitted)

[56] *Id.* at 1092–93.

[57] *Id.*

[58] *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1005 (10th Cir. 2014) (three instances of actual confusion); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1151 (10th Cir. 2013) (four instances); *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1535 (10th Cir. 1994) (three affidavits alleging confusion, including two by the plaintiff's employees that they had received a number of accounts of customer confusion).

[59] *Sally Beauty Co.*, 304 F.3d at 974.

of the product," 7% of respondents believed "Kodiak was the source of the Krusteaz protein pancake mix," and 5.7% of respondents believed there was some level of affiliation between the two pancake mixes.[60] However, a look at the raw data shows that 28% of respondents believed that Kodiak was the source of the protein mix and 42.4% of respondents believed there was some relation between the two pancake mixes.[61]

Putting aside the Court's concerns about the evidentiary value and methodology used in the survey, Defendant's evidence tends to support Plaintiff's claim of actual confusion rather than detract from it. This support is found in not only the raw data, but also the comments provided by the survey takers, which Defendant's expert does not address. As Plaintiff points out, those statements include some of the following comments about the similarity of the packaging: "They basically took the entire design and could get sued;" "They look exactly the same just with different pictures and words;" "The product seems identical;" "They look almost exactly alike;" "Wouldn't it be copyright infringement or something I don't think it's legal to do that."[62] These types of statements are riddled throughout the study.[63]

Considering all of the evidence, the Court finds that this factor weighs in favor of Plaintiff. Plaintiff has provided evidence of numerous instances of actual confusion. Further, Defendant's survey evidence shows that over 42% of the treatment group respondents believed there was some connection between the two mixes. This combined evidence supports a showing of actual confusion.

---

[60] Docket No 30-2, at 9–10.

[61] *Id.* at 59.

[62] Docket No. 35, at 2 (citing Docket No. 30-2).

[63] Docket No. 30-2, at 108–52.

iv.     Similarity of Products and Manner of Marketing

"The greater the similarity between the products, the greater the likelihood of confusion."[64] The Court separately considers "(1) the similarity of products and (2) the similarity in the manner of marketing the products."[65]

First, the two products are very similar. Both products are protein-rich pancake mixes packaged in a box. Notably, both packages prominently tout the high protein content of the pancake mix. Second, the products reach the consumers through the same markets. Both pancake mixes are available throughout the United States in prominent retail and grocery establishments. Not only does the evidence show that they are often found in the same stores, it further shows that they are found in the same aisle, and in some cases, right next to each other. "[T]he possibility of confusion is greatest when products reach the public by the same retail outlets."[66] This factor, therefore, weighs heavily in favor of Plaintiff.

v.     Degree of Care Exercised by Consumers

The Tenth Circuit has held that "buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse."[67] "Accordingly, items purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully."[68] Here, both products are less than $5.00. Pancake mix is a relatively inexpensive

---

[64] *Sally Beauty Co.*, 304 F.3d at 974 (internal quotation marks and citation omitted).

[65] *Id.*

[66] *Id.* at 975 (internal quotation marks and citation omitted).

[67] *Beer Nuts Inc.*, 805 F.2d at 926 (internal quotation and citation omitted).

[68] *Sally Beauty Co.*, 304 F.3d at 975.

item and, thus, more likely to be purchased on impulse. However, the cost of the product is not necessarily determinative.[69]

Defendant argues that consumers of pancake mix are more likely to care about "the nutritional value, number of ingredients, and degree of processing in their mix,"[70] and, therefore, are more likely to pay attention to brand. Defendant supports this assertion with the affidavit of Defendant's President and Chief Growth Officer, which merely states that Defendant's market research suggests that "pancake mix consumers wanted high protein, whole grain and fiber content with fewer ingredients, all without sacrificing taste."[71] This allegation does not naturally lead to the conclusion that, despite the fact that pancake mix is likely to be purchased on impulse, all consumers of pancake mix are likely to pay significant attention to the brand of a mix. A market analysis of any product type would certainly produce a list of qualities some consumers look for when purchasing that type of product. Without more, this evidence is not sufficient to demonstrate that consumers exercise a high degree of care when purchasing pancake mix. As a result, this factor weighs in favor of Plaintiff.

      vi.     Strength of the Mark

"The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion."[72] To assess the relative strength of a mark, courts consider two aspects of strength: "conceptual strength, or the mark's place on the spectrum of distinctiveness; and commercial strength, or its level of recognition in the marketplace."[73]

---

[69] *Hornady Mfg. Co.*, 746 F.3d at 1006.

[70] Docket No. 28, at 17.

[71] Docket No. 30 Ex. 1 ¶ 12.

[72] *Sally Beauty Co.*, 304 F.3d at 975.

[73] *Hornady Mfg. Co., Inc.*, 746 F.3d at 1007.

First, the Court finds that the conceptual strength of the trade dress is strong, for the reasons discussed above.

Second, the Court finds that the commercial strength of the trade dress is strong. "Commercial strength is 'the marketplace recognition value of the mark.'"[74] "Commercial strength is a concept analogous to secondary meaning."[75] The Tenth Circuit has

> identified several factors as helpful in evaluating secondary meaning, including direct evidence of recognition by consumers and circumstantial evidence regarding: (1) the length and manner of the mark's use, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts made to promote a conscious connection, in the public's mind, between the mark and a particular product.[76]

Plaintiff argues its trade dress is commercially strong because of the "years of effort and substantial amount of money that Kodiak has spent forging a connection between its trade dress and its pancake mixes in the minds of public."[77] Defendant argues that Plaintiff's trade dress is weak and not entitled to protection because Plaintiff's advertising lacks a "look for" element that "asks consumers to look for the distinctive packaging of the plaintiff's product."[78] In support, Defendant provides a number of Plaintiff's advertisements and media clippings that prominently feature the Kodiak Cakes bear and not the trade dress itself. In its Reply, Plaintiff provides its Instagram and Facebook history, which shows that, while not featured in each of its advertisements, the Kodiak Cakes trade dress is commonly shown and highlighted in Plaintiff's advertising images. Defendant's argument is, therefore, unpersuasive.

---

[74] *Water Pik*, 726 F.3d at 1153 (quoting *King of the Mountain Sports, Inc.*, 185 F.3d at 1093).

[75] *Id.* at 1154.

[76] *Hornady Mfg.*, 746 F.3d at 1008.

[77] Docket No. 16, at 18.

[78] *See* Docket No. 28, at 11.

Additionally, as previously discussed, prior to Defendant's new protein pancake mix packaging, Plaintiff's trade dress was noticeably distinct when compared to the competing market. Plaintiff and Defendant provided a number of examples of competing pancake mixes, most of which appear drastically different than Plaintiff's packaging and quite similar to each other. While there were some boxes with a kraft box and more rustic feel, none utilized the same color scheme or general theme.

Based on the conceptual strength of the mark, the advertising efforts of Plaintiff, and the unique packaging of Kodiak Cakes in the pancake mix industry, the Court finds this factor weighs strongly in favor of Plaintiff.

Based upon the above, the Court finds that Plaintiff has met its burden in showing it is likely to succeed in demonstrating a likelihood of confusion.

### 3. Nonfunctional

The Tenth Circuit adopted a test for functionality that focuses on the product's effect on competition.[79] The proper question when determining whether a trade dress is functional "should turn on whether the protection of the configuration would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods."[80]

Plaintiff's trade dress is not functional such that it would hinder its competitors from fairly competing in the marketplace. Defendant argues that its market research showed that use of a kraft box attracts a certain type of customer. Therefore, preventing Plaintiff's competitors from being able to use a kraft box would hinder Defendant's ability to compete fairly in the protein pancake marketplace. That issue, however, is not before the Court. Plaintiff does not

---

[79] *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 519 (10th Cir. 1987).

[80] *Id.* (internal quotation marks and citation omitted).

claim its trade dress is only a kraft box. It claims trade dress protection for all the elements of its packaging taken as a whole. Even if, as Defendant argues, the kraft box is functional, "[a] combination of features may be nonfunctional and thus protectable, even though the combination includes functional features."[81]

Because Plaintiff has demonstrated that (1) its trade dress is inherently distinctive; (2) the balance of each of the factors for consideration weigh in favor of finding a likelihood of confusion between the parties' protein pancake mix product; and (3) its trade dress is non-functional, the Court finds that Plaintiff has met its burden in demonstrating it is likely to succeed on the merits of its trade dress infringement claim.

## B. IRREPARABLE HARM

"The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."[82] "The movant must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages."[83]

Plaintiff argues that it has demonstrated irreparable harm in the form of customer confusion, lost customers, loss of goodwill, and reputational damage. The Tenth Circuit has found that "loss of customers, loss of goodwill, and further erosion of [a business'] competitive position" are "the types of factors that district courts should consider when deciding whether a plaintiff has shown a sufficient probability of irreparable harm."[84]

---

[81] *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir. 1988).

[82] *DTC Energy Grp., Inc*, 2018 WL 6816903, at *4 (internal quotation marks and citation omitted).

[83] *Id.* (internal quotation marks and citations omitted).

[84] *DTC Energy Grp., Inc*, No. 18-1113, 2018 WL 6816903, at *4 (citing *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004)); *see also Happy*

Here, Plaintiff has failed to provide a strong showing of loss of goodwill or reputational damage as a result of Defendant's conduct. However, Plaintiff has provided evidence that it has expended significant resources to develop its brand and that some of its customers are purchasing Defendant's product by mistake. The number of actual customers purchasing Defendant's product by mistake is impossible to ascertain. This is especially true given the inexpensive nature of the products. The Tenth Circuit has noted that "[p]urchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product."[85] The fact that Plaintiff does have such evidence is telling.

To further support its claim of irreparable harm, Plaintiff has provided sales data which shows that, after Defendant introduced the accused packaging, Defendant's sales of its protein mix increased while Plaintiff's sales decreased. While Defendant is correct that this evidence does not conclusively demonstrate that the accused packaging has resulted in lost sales, it provides support for Plaintiff's claim that it has and is continuing to lose customers and its competitive position is weakened based on Defendant's alleged infringement. Based upon this, the amount of damages would be difficult, if not impossible to ascertain, and Plaintiff has shown it is likely to suffer irreparable harm without the issuance of an injunction.[86]

C. BALANCE OF THE HARMS

As discussed, Plaintiff has shown it is likely to suffer irreparable harm if Defendant is permitted to continue selling its protein pancake mix as it is currently packaged. Defendant has

---

*Sumo Sushi, Inc. v. Yapona, Inc.*, No. 2:08-CV-348 TS, 2008 WL 3539628, at *6 (D. Utah Aug. 11, 2008) ("Happy Sumo has shown irreparable harm by the loss of good will, business reputation, and loss of control over its trade dress.").

[85] *Beer Nuts, Inc.*, 805 F.2d at 928.

[86] Because Plaintiff has shown irreparable harm, the Court need not address whether harm can be presumed.

also presented evidence that it would incur substantial costs if it is forced to stop distribution of its current protein pancake mix packaging sooner than planned. Defendant "would incur direct costs related to any recall and product spoilage, would suffer damages to its hard-earned retailer relationships, could permanently lose valuable shelf space, and, as a result, could lose millions of dollars in future sales."[87]

The Court agrees that Defendant is likely to suffer hardship if the injunction is issued. However, the Tenth circuit has held that "when the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement."[88] Here, Plaintiff has made a strong showing of a case of infringement, therefore, the balance of harms factor must favor Plaintiff.

D. PUBLIC INTEREST

Finally, that the Court finds that public interest favors granting the injunction. While public interest favors inter-market competition, that competition must be fair. Public interest in fair competition dictates that Defendant should not be allowed to profit off the efforts of Plaintiff in achieving its commercial success. Public interest also disfavors allowing competition at the expense of customer confusion.

Having found that each of the four requisite factors for a preliminary injunction weigh in favor of Plaintiff, the Court will grant Plaintiff's Motion.

---

[87] Docket No. 28, at 23.

[88] *Gen. Motors Corp.*, 500 F.3d at 1229.

## III. CONCLUSION AND PRELIMINARY INJUNCTION

It is therefore

ORDERED that Plaintiff's Motion for Preliminary Injunction (Docket No. 16) is GRANTED and the Court enters the following preliminary injunction.

IT IS HEREBY ORDERED that Defendant, and each of its respective officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any one of them, ARE HEREBY PRELIMINARILY ENJOINED AND RESTRAINED pending the final hearing and determination in this action from:

a. Continuing to sell, advertise, or promote any product using the infringing packaging, or using any packaging that is otherwise confusingly similar to the Kodiak Trade Dress;

b. Within 7 days of the date of this Order, Defendant shall cease production of the current Krusteaz Protein Packaging;

c. Within 7 days of the date of this Order, Defendant shall initiate a recall of all product packaged in the current Krusteaz Protein Packaging;

d. Within 7 days of the date of this Order, Defendant shall remove or destroy all signs, posters, pictures, billboards, advertisements, or other printed matter that displays the current Krusteaz Protein Packaging in any manner or that otherwise displays any packaging that is confusingly similar to the Kodiak Trade Dress; and

e. Within 7 days of the date of this Order, Defendant shall remove all internet posts, pictures, or other material (including but not limited to on Defendant's Facebook, Instagram, and other social media pages) that display the current Krusteaz Protein Packaging in any manner or that otherwise displays any product packaging that is confusingly similar to the Kodiak Trade Dress. It is further

ORDERED that pursuant to 15 U.S.C. § 1116(a), Defendants shall file with the Court and serve upon Plaintiff, within thirty (30) days of service of this Order, a report in writing and under oath, setting forth in detail the manner and form in which Defendants have complied with this injunction. It is further

ORDERED that Plaintiff shall post a bond in the amount of $1,000,000. This Order will be effective upon posting of the required security.

DATED this 18th day of January, 2019.

BY THE COURT:

Ted Stewart
United States District Judge